## **AFFIDAVIT**

Richard C. Bernecker, first being duly sworn, deposes and says:

1. I am a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA) and have been for approximately three (3) years. Prior to my assignment as a Task Force Officer, I was a Patrolman and Detective at the Colerain Police Department. I have been employed as a police officer for twelve (12) years. As a Task Force Officer with the DEA, my duties have included the investigations of violations of federal laws concerning the importation, manufacture, possession and distribution of controlled substances as defined by Title 21, United Stated Code, including controlled substances such as heroin, cocaine, methamphetamine, and other dangerous drugs. During my tenure as a police officer, I have participated in numerous investigations involving drug trafficking and have attended numerous specialized training schools conducted by the DEA and other law enforcement agencies. Some of the training I have attended include: DEA Basic Investigators School, Operation Jet-way Training (training that is specialized to airplane, train, and bus interdiction), Interdiction Training and many more. I have participated in all aspects of drug investigations, including physical surveillance, undercover operations, execution of search warrants, interdictions and arrests of drug traffickers.

2. The information in this Affidavit is based on my personal investigation and does not include all information obtained during this investigation, rather only that believed necessary to provide a legal basis for the civil forfeiture.

3. On September 24, 2015, agents from the DEA Cincinnati RO and detectives from the Cincinnati/Northern Kentucky International Airport Police Department (Airport Police) received information that David Najib Jallouli was traveling from Washington, DC, to San Francisco, California, with a connecting flight through Cincinnati, on a suspicious flight itinerary: he was travelling on a recently purchased—one (1) day—one-way airline ticket to a known source city/state. A check of his criminal history showed prior charges for possession of marijuana and possession with intent to distribute cocaine, and other non-drug related charges.

4. I responded to the airport terminal departure gate for Jallouli's flight to San Francisco along with TFOs Bill Conrad and Bryan Sutton, and Detective Justin Kuhn and K-9 Officer Norman Minter with the APD. Det. Kuhn positioned himself behind the ticket agent to observe passengers' names as their boarding passes were being scanned. Det. Kuhn notified TFO Sutton when Jallouli's ticket was scanned. TFO Sutton identified himself as a police officer and asked Jallouli if he could speak with him. Jallouli agreed. During the consensual encounter, Jallouli was standing in the entrance of the jet-way, free to walk away at any time.

5. TFO Sutton asked Jallouli for identification and he provided a Maryland Identification Card displaying the name David Najib Jallouli. TFO Sutton advised Jallouli that he is part of an interdiction group and asked Jallouli if he was

traveling for business or pleasure. Jallouli stated that he was traveling to San Francisco to buy a car. TFO Sutton asked Jallouli if he was traveling with any weapons, narcotics, or large sums of currency, to which he responded that he was traveling with money. TFO Sutton asked where the currency was located and how much it was and Jallouli advised it was in his carry-on bag and it was a couple thousand. At this point, I introduced myself as a police officer and asked Jallouli if I could speak with him. Jallouli agreed.

6. I asked Jallouli if a couple thousand meant $2,000.00, and he stated that he had more like $8,000.00 to $20,000.00, but was not sure of the exact amount. I asked Jallouli if the currency was in his carry-on bag and he stated that it was. I asked Jallouli for permission to search his carry-on bag and he stated, "Yeah, that's fine," verbally consenting to the search. As soon as the carry-on bag was opened, the other agents and I could smell the strong odor of raw marijuana coming from it. I asked Jallouli if he had marijuana in the bag and he responded, "Nope." I asked if he had transported marijuana in the bag and he stated, "No, I don't even smoke weed." Packaging bags and a plastic tube that had the strong odor of marijuana coming from it was found inside the carry-on bag along with two (2) large vacuum sealed bricks of U.S. currency concealed inside a towel. I asked Jallouli why the currency was vacuum-sealed in plastic and he stated that it was the safest way to bring it.

3

7. Next I asked Jallouli for permission to search his person and again he stated, "Yeah, go ahead," verbally consenting to the search. The search of Jallouli's person revealed nothing of evidentiary value.

8. I asked Jallouli how he obtained so much money and he stated that he works and has been saving it for a really long time. I asked where he works and how much he makes in a year. Jallouli stated that he works as a carpenter, but did not know the name of the company he works for. He said he makes $16-20 an hour, but did not know how much he made in a year. I asked him how much he paid in taxes, and he said he had no idea. I asked if he had any proof of income and he stated that he did not. I asked Jallouli where he lives in Washington DC and how much he paid in rent. He stated that he rented a room from a friend for $500 a month.

9. I then asked Jallouli where he was planning on staying in California. At first he stated that he did not know, then he said he was staying with a friend. I asked if he had any proof that he was going to stay with a friend and he stated that he didn't have anything showing that. When asked how long he was planning to stay before flying home Jallouli said, "As long as it takes."

10. I then questioned Jallouli about his stated purpose for travel—to buy a car. I asked what kind of car he was going to buy that he could not get in Washington DC. He stated that he did not know and would just look for deals. I asked him if he had any proof that he had been shopping for a car such as web searches on his phone or car buying magazines. Jallouli stated that he did not have any of that. When asked how he was planning on getting the car back to Washington, DC, he stated

4

that he was either going to have it shipped or just drive it back. I asked if he thought that would be expensive when he could just get a car in DC and he stated, "Yeah, I guess."

11. Jallouli was next questioned about his criminal history, specifically he was asked if he had he ever been in trouble, and he stated, "Yeah, just for traffic stuff." I asked for permission to search his cell phone for any talk of narcotics and he refused.

12. I then advised Jallouli that the currency was going to be seized as suspected drug proceeds. I further advised him that his phone would be seized and we would apply for a Commonwealth of Kentucky Search Warrant for the phone's content.

13. The seized currency was placed in an evidence envelope and transported to the Airport Police Department. There the currency was removed from the evidence envelope and hidden in a location unknown to the drug detection K-9 and his handler. The drug dog located the currency and made a positive alert. The currency was subsequently counted and found to total $36,300.00.

14. A state search warrant was obtained for the cell phone seized from Jallouli. APD officers were able to obtain a Cellebrite image of the phone and found that it contained two (2) videos of drug transactions at what appears to be a concert, two text messages that are indicative of drug trafficking, and an Instagram photo of KHAT—a controlled substance that is chewed for a stimulating effect which is similar to, but less intense than, those caused by cocaine or methamphetamines.

15. Several factors contributed to the officers' belief that there was probable cause that the U.S. currency carried by Jallouli was proceeds of drug-related activities, including:

    a. travel on a recently purchased one-way airline ticket to a known source city/state;

    b. vague responses regarding amount of cash carried, employment, and income;

    c. implausible story regarding purpose of travel;

    d. strong smell of raw marijuana emitting from carry-on bag;

    e. manner in which currency was packaged—rubber-banded and vacuum-sealed;

    f. drug-related text messages and videos on cell phone;

    g. drug-related criminal history; and

    h. positive alert by drug-detecting dog.

11. On or about December 4, 2015, David Jallouli filed a claim to $36,000.00 seized from him in the DEA's administrative forfeiture proceeding.

For the above-stated reasons, your affiant believes that the seized currency was furnished or intended to be furnished in exchange for controlled substances, was proceeds traceable to such an exchange, or was intended to be used to facilitate the illegal sale of narcotics and is, therefore, subject to seizure and forfeiture to the United States of America pursuant to 21 U.S.C. § 881 (a)(6).

6

This __/__ day of March, 2016.

_____
Richard C. Bernecker, Task Force Officer
Drug Enforcement Administration

Subscribed, sworn, and acknowledged before me by Richard C. Bernecker this the __1__ day of March, 2016.

My Commission expires: _October 2, 2018_

_____  520432
NOTARY PUBLIC, STATE AT LARGE